```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3   _____

 4   UNITED STATES OF AMERICA,

 5                      Plaintiff,
                                            DOCKET NO. 1:20-mj-416
 6   vs.

 7   DANIEL HARRIS,

 8                      Defendant.

 9   _____/

10

11              TRANSCRIPT OF DETENTION HEARING

12       BEFORE UNITED STATES MAGISTRATE JUDGE SALLY J. BERENS

13                     GRAND RAPIDS, MICHIGAN

14                        October 13, 2020

15

16   Court Reporter:            Glenda Trexler
                                Official Court Reporter
17                              United States District Court
                                685 Federal Building
18                              110 Michigan Street, N.W.
                                Grand Rapids, Michigan 49503
19

20   Proceedings reported by machine shorthand, transcript produced

21   by computer-aided transcription.

22

23

24

25
```

```
 1   A P P E A R A N C E S:
 2   FOR THE GOVERNMENT:
 3       MR. NILS R. KESSLER
         UNITED STATES ATTORNEY'S OFFICE
 4       330 Ionia Avenue, N.W.
         P.O. Box 208
 5       Grand Rapids, Michigan 49501-0208
         Phone:  (616) 456-2404
 6       Email:  Nils.Kessler@usdoj.gov
 7       MR. AUSTIN JACOB HAKES
         UNITED STATES ATTORNEY'S OFFICE
 8       330 Ionia Avenue, N.W.
         P.O. Box 208
 9       Grand Rapids, Michigan 49501-0208
         Phone:  (616) 456-2404
10       Email:  austin.hakes@usdoj.gov
11   FOR DEFENDANT HARRIS:
12       MR. THOMAS WILLIAM PARKER DOUGLAS
         DOUGLAS LAW, PLLC
13       106 East 8th Street
         Holland, Michigan 49423
14       Phone:  (801) 699-7746
         Email:  parkerdouglas66@gmail.com
15
16                       *   *   *   *   *
17                              Grand Rapids, Michigan
18                              October 13, 2020
19                              3:15 p.m.
20                   P R O C E E D I N G S
21       THE COURT:  All right.  We're back on the record for
22   a bond hearing for Mr. Harris.  Let's start -- Mr. Kessler and
23   Mr. Hakes are still here and Mr. Douglas on behalf of
24   Mr. Harris who is also present.
25           Mr. Kessler, are you ready to proceed?
```

1          *MR. KESSLER:*  Yes, Your Honor.  As we did with
2     Mr. Franks, Your Honor, I'll just start by recapping a few
3     exhibits that were specific to Mr. Harris.  And then I'm going
4     to call the agent to put on two more exhibits that are relevant
5     to the detention question.  You let me know when you have them
6     in front of you if you'd like, Your Honor.
7          *THE COURT:*  Which ones?  I'm sorry.
8          *MR. KESSLER:*  I wanted to make sure you had them
9     ready before I started calling them out.
10         *THE COURT:*  Yes.
11         *MR. KESSLER:*  So Exhibit 3, Mr. Harris is the one who
12    in that encrypted text message suggested just capping her, that
13    being the governor.
14         And Exhibit 10 is on page 8.  Again, he's the one who
15    goes by the moniker of Beaker.
16         And Exhibit 10 was -- yes.  Would you like me to
17    bring them up on the screen, Your Honor?
18         *THE COURT:*  That's fine.  If that's easy.  That's
19    probably helpful for everyone else in the courtroom to know
20    what we're talking about.
21         What pages are you headed towards, Mr. Kessler?
22         *MR. DOUGLAS:*  I'm headed towards page 8 of
23    Exhibit 10.  Right here.  This is the text if you recall,
24    Your Honor, where everybody was freaking out about their group
25    being infiltrated by the feds.

1               *THE COURT:*  Uh-huh.
2               *MR. KESSLER:*  And there are a number of these, but,
3    for example, this one, Beaker suggests they all get together at
4    10:00 at his house and stay off of Wire because they have been
5    potentially penetrated by the feds.  So he's clearly aware --
6    so that's consciousness of guilt -- they are clearly aware they
7    were doing something wrong.
8               *THE COURT:*  And is that the meeting that is on
9    August 23rd?
10              *MR. KESSLER:*  This is actually -- what's the date?
11   This is August 18.  This is an encrypted chat messaging.
12              *THE COURT:*  I understand.  But when he's saying
13   "Sunday at my house," is that the August 23rd meeting that is
14   referenced in the Complaint?
15              *MR. KESSLER:*  Yes.  That would be the meeting where
16   everybody had to bring their ID to his house and prove who they
17   actually were.
18              *THE COURT:*  Okay.
19              *MR. KESSLER:*  He reiterates the same thing on
20   pages 12 and 13.  He's the one at the very end who is
21   telling -- I'll scroll down to it -- telling everyone "You
22   still haven't done it.  Switch over to the new encrypted
23   application today."
24              We also rely on Exhibit 11, which is the one that
25   follows this, where he actually sets up the new encrypted

1  communications channel and is the founding member here.  It
2  says the group creator is Beaker.
3              And moving down to the third page again.  This is the
4  one who promotes it to everybody else in the group as being an
5  application that allows you to erase your entire history so the
6  feds can't find it.  Again showing consciousness of guilt.
7              By September 23rd when their plans were well
8  underway, we heard testimony from Special Agent Trask about
9  people wrapping up loose ends.  And we heard that with
10 Mr. Caserta talking about killing some cops who had made him
11 angry.  We have -- if we can call the agent right now, I'll put
12 on one additional exhibit as to that.
13             *THE COURT:*  And you're still under oath, sir.  You
14 understand that?
15             *THE WITNESS:*  Yes, ma'am.
16             *THE COURT:*  All right.
17                            RICHARD TRASK
18                *(The oath was previously administered)*
19                          DIRECT EXAMINATION
20 *BY MR. DOUGLAS:*
21 *Q.*  So, Agent Trask, we were just discussing how Mr. Caserta
22 had been wrapping up some loose ends.  Did Mr. Harris also make
23 a pitch to other members of this group to wrap up some loose
24 ends of his own?
25 *A.*  Yes, he did.

1   *Q.*   I'm going to bring up Exhibit 28, and this is one of those
2   encrypted chats on Threema, correct?
3   *A.*   That's correct.
4   *Q.*   Again, it's the same group.  It starts at the top it's the
5   FAFO group.  Includes Debased Tyrant, that's Mr. Caserta; Alpha
6   Fuck You, that's Adam Fox; Beaker, that's this defendant;
7   Gunny, Mr. Garbin; Red Hot, Mr. Franks.  And let me highlight
8   the first message from Mr. Franks -- or from Mr. Harris.  Can
9   you read that, please?
10  *A.*   A, "So who would want to go to Maine to kill an ex-cop for
11  a friend of mine and get her shit from him?"
12  *Q.*   So he's soliciting other people to go commit a murder?
13  *A.*   That's correct.
14  *Q.*   And I won't read -- have you read all of this, but what's
15  the gist of the backstory that he's laying out here in the
16  exhibit?
17  *A.*   Apparently he had a friend in Maine and there was some
18  issue with what he believed to be a dirty cop.  Essentially he
19  wanted to gather a group together and go kill that ex-cop and
20  potentially the wife and dispose of the bodies.
21  *Q.*   Okay.  Now, we're going to get to that last part in a
22  second.  Let's scroll down here a little bit.
23      So he actually talks about what he knows about the house
24  and the neighborhood, correct?  What does he say here?
25  *A.*   That's correct.  He mentions it's in Maine, and he's got a

1  wife and her family lives up the street.  Some cousins
2  next-door.
3  *Q.*   So the same kind of pattern, like checking out the place
4  before you go?
5  *A.*   That's correct.
6  *Q.*   And then let's just read this last part.  What does he say
7  they are going to need to do?  If you would read that, please.
8  *A.*   Yes.  So -- sorry.  Yes.  Yes, "So figured pay him a
9  visit.  Get the shit, obviously.  Have to dispose of him and
10 maybe the wife."
11 *Q.*   And does he even say anywhere in this chat that the wife
12 of this supposed ex-cop has done him any wrong?
13 *A.*   There's no mention of the wife prior to that.
14 *Q.*   All right.  So just casually mentions killing her?
15 *A.*   That's correct.
16 *Q.*   Okay.
17           *MR. KESSLER:*  And I offer this into evidence,
18 Your Honor.  I'll call it Exhibit 28.  It's just part of the
19 whole big thing, unless you want to start over.
20           *THE COURT:*  No, that's fine.
21           Any objection?
22           *MR. DOUGLAS:*  No objection, Your Honor.
23           *THE COURT:*  It's admitted.
24 *Q.*   *(BY MR. KESSLER)*  Agent Trask, we talked about October 7th
25 which was the day that everybody was going to meet Red to

1  purchase the explosives. And Mr. Harris was in one of the cars
2  that was going there, correct? Some people carpooled together?
3  A.  That's correct.
4  Q.  And who else was in the car with Mr. Harris?
5  A.  It was all the individuals to include the CHS.
6  Q.  Okay. And where was the CHS sitting in relation to
7  Mr. Harris?
8  A.  The CHS was in the driver's seat driving the vehicle and
9  Mr. Harris was located behind him.
10 Q.  Okay. So in one of the backseats?
11 A.  Yes.
12 Q.  All right. And did he do anything noteworthy on the trip
13 over?
14 A.  So according to the CHS during debriefing, the entire ride
15 over Mr. Harris was repeatedly unloading the weapon, removing
16 the round.
17 Q.  When you say "the weapon," are we talking about a
18 semiautomatic pistol?
19 A.  Yes, a semiautomatic pistol. Removing the round, pulling
20 the trigger, reloading. And then at one point I believe it was
21 the CHS asked "What the hell are you doing?" or something along
22 those lines. At which point Harris pointed the gun to CHS's
23 head and held it there until CHS finally yelled at him and
24 said, "Get that thing away from me."
25          *MR. KESSLER:* I have nothing further, Your Honor.

1    *THE COURT:* Mr. Douglas.
2                        CROSS-EXAMINATION
3    *BY MR. DOUGLAS:*
4    *Q.*   Now, Agent Trask, you were just shown a description about
5    an officer in Maine?
6    *A.*   Yes.
7    *Q.*   After that discussion there's nothing ever said about that
8    officer in Maine again, is there?
9    *A.*   I don't recall after that discussion.
10   *Q.*   So there's no follow-up to that discussion?
11   *A.*   Not that I'm aware of at this time.
12   *Q.*   And you are the main case agent on the case, right?
13   *A.*   Pardon?
14   *Q.*   You are the main agent on the case, right?
15   *A.*   I am the main agent on one of the cases as we discussed.
16   *Q.*   Okay.  But if there was more talk about it, you would know
17   about it, wouldn't you?
18   *A.*   I would have to go through the encrypted chats, so . . .
19   *Q.*   But you would know -- you don't know of any other further
20   discussion about this?
21   *A.*   I'm not aware at this time.
22   *Q.*   Okay.  And when we were shown weapons earlier, none of
23   those were from Mr. Harris's house; is that correct?
24   *A.*   If I recall correctly, no, that is correct.
25              *MR. DOUGLAS:*  No more questions on cross, Your Honor.

1             *THE COURT:*  Thank you.
2             Further proofs, Mr. Kessler?
3             *MR. KESSLER:*  No, Your Honor.
4             *THE COURT:*  Mr. Douglas, any proofs?  Either by
5    proffer or by --
6             *MR. DOUGLAS:*  I'll go by proffer.
7             *THE COURT:*  All right.  I'm sorry?
8             *MR. DOUGLAS:*  I'll go by proffer.
9             *THE COURT:*  You can go ahead.
10            *MR. DOUGLAS:*  Thank you.
11            Your Honor, by proffer I would, like prior counsel,
12   make reference to the Pretrial Report.  I think that there's --
13   and again like prior counsel I would focus on possible danger
14   to the community going forward.
15            I think that there -- in the report itself there's no
16   indication that Mr. Harris has connections outside of Michigan.
17   When he's left Michigan, he's left because he was part of the
18   Armed Services.  He lives with his parents, and he would
19   continue to live with his parents if permitted bond in this
20   case.
21            Other than that, I would just point out, as I did
22   when I crossed Agent Trask earlier, that, you know, there are
23   several of the occasions where Mr. Harris isn't present.  And
24   there are many times where he's included on chats where he
25   doesn't respond so we have no idea what he may or may not have

1  thought about that.
2  　　　　And with that, Your Honor, I would save the rest for
3  argument.
4  　　　　*THE COURT:* Thank you.
5  　　　　Mr. Kessler, any argument?
6  　　　　*MR. KESSLER:* Yes, Your Honor. And I will be
7  relatively brief here because I think we covered a lot of the
8  same ground with the last defendant, so I think the same things
9  apply.
10 　　　　If this was a credit card fraud or something like
11 that, we might be talking about a different situation. But the
12 nature of the offense is very serious. He's armed, he's
13 trained, he has the military background, which is -- makes him
14 in some ways even more dangerous than some of his more amateur
15 colleagues here. And of all the things he did, the part about
16 them going to go case the governor's house in the middle of the
17 night is definitely the most concerning. That's just not
18 something a normal person does if they don't mean it.
19 　　　　Again, like Mr. Caserta, tying up loose ends, talking
20 about the murder of a police officer here, I think that shows
21 us two things: First, that he was serious about the plot
22 because you don't even start talking about doing something
23 crazy like killing somebody who you have barely any relation to
24 if you're not thinking that the boogaloo is coming or chaos is
25 coming and you're not going to be held accountable for it.

1     It also shows that he's just got a dangerous way of
2 looking at things.  It's very casual to just suggest, well, you
3 know, I'm going to have this time on my hands before everything
4 happens and let's go ahead and kill this guy I barely know back
5 in Maine and then just kill his wife for no reason.  There's
6 nothing in the chats to suggest that it's said in jest.  And
7 obviously he didn't do it.  I agree with his counsel, you know,
8 that there's nobody dead in Maine that we know of.  But just
9 the suggestion thrown out there to a group like this is
10 dangerous all by itself.
11     And then finally we just see some evidence that he's
12 really a volatile kind of person if on the way over to meet the
13 explosives expert on October 7th he's just sitting back there
14 and can't stop playing with, you know, a semiautomatic pistol
15 and puts it to somebody's head for almost no reason.  I just
16 think all those things together give us the sense that there's
17 nothing short of detention that's really going to work to keep
18 the public safe here.
19     *THE COURT:*  Thank you.
20     Mr. Douglas.
21     *MR. DOUGLAS:*  Your Honor, I'll focus on danger,
22 ongoing danger to the public, since that's where we seem to
23 have gone.
24     First I would say that there's no allegation or
25 indication that, like the prior defendant, Mr. Harris had any

1  desire or action to find some unmarked gun.  That's just not
2  here.
3          I'd also note that what we have are what we've seen,
4  statements, and statements that there was no follow-through on.
5  So the question is, as Your Honor pointed out previously, is
6  there a condition or combination of conditions that the Court
7  may impose to show that he's not an unreasonable risk of danger
8  to the community?  And Your Honor knows that, you know, it's
9  not a hundred percent that we look for, although we sure try.
10         Now, there are several conditions -- most of them are
11 listed in the report here -- Your Honor can impose.  House
12 arrest at his parents' I think is appropriate if Your Honor
13 does.  Again a location monitor, an ankle monitor.  One that
14 would show -- you know, one that could be tripped if he left
15 the house if Your Honor thinks the conditions have to be that
16 strict.  But to say that those conditions don't assure the
17 reasonable safety of the community I think is just nonsense.
18         There are -- the conditions will essentially keep him
19 in his house, and there's -- and we can also say that there's
20 no -- no access to the computer or phones if you want to cut
21 off communications as well.  And so I don't think that this is
22 one where -- especially given the fact that he has no criminal
23 history prior to this, this isn't a presumption case, and if --
24 unless we're going to say categorically anybody who is alleged
25 to have committed these things is de facto a danger to the

1   community and can't be managed, I think that there are
2   conditions.  And I won't belabor the point, but I would just
3   leave it at that.
4               *THE COURT:*  Thank you.
5               Mr. Kessler, is there a last word?
6               *MR. KESSLER:*  Nothing, Your Honor.
7               *THE COURT:*  All right.  This matter is governed by
8   the Bail Reform Act of 1984.  Under the Bail Reform Act I have
9   to release the defendant on bond unless I find by a
10  preponderance of the evidence that he is a risk of flight or
11  nonappearance or by clear and convincing evidence that he's a
12  danger to the community.  I am required to consider the
13  least-restrictive condition or combination of conditions that
14  will reasonably assure his appearance and protect the
15  community.  And I have considered each of the possible
16  conditions set out in the statute, with special emphasis on
17  those enumerated in the Pretrial Services Report.
18              In determining whether there are sufficient
19  conditions to reasonably assure your appearance or to protect
20  the community, I am required to consider a number of factors,
21  including the nature and circumstances of the offense charged,
22  including the seriousness of the offense and whether it's a
23  crime of violence, the weight of the evidence.  The
24  Sixth Circuit in the United States versus Stone, which is a
25  very similar case in many respects, although there was a

1   presumption in that case which is not at issue here, but that
2   case notes that weight-of-the-evidence factor is the weight of
3   the evidence of dangerousness.  And I'll focus on that since
4   risk of flight really isn't an issue here.
5              In addition, I have to consider the history and
6   characteristics of the defendant, your history and
7   characteristics, and the nature and the seriousness of the
8   danger to any person or the community that would be posed by
9   the defendant's release.
10             As I note, I don't -- I didn't hear the government
11  put particular emphasis on risk of flight, and I don't think
12  that there is a preponderance of the evidence here that he is a
13  risk of flight given his ties to the community.
14             I would note a number of things from the
15  Pretrial Services Report that in many respects factor in favor
16  of Mr. Harris.  He's 23 years old.  He was honorably discharged
17  last year from the Marine Corps.  He is living with his parents
18  and has been employed from time to time during the period
19  following his service.  He also is receiving veterans
20  disability benefits due to some injuries.
21             He does have -- neither of the parties really talked
22  about this, but he was diagnosed with insomnia and anxiety back
23  in June of last year.  And although he did not set forth any
24  suicidal thoughts or ideations at the time that he was
25  arrested, he advised that he has had suicidal thoughts while he

1  was in the military because he did not feel he was treated well
2  and he hated his life at the time.
3      There is some evidence of some substance use,
4  although it's a little bit difficult to take from the
5  Pretrial Services Report, and I don't take from the
6  Pretrial Services Report that that is necessarily abuse.
7      And under normal circumstances if the crime charged
8  here were credit card fraud, as I think the government would
9  concede, Mr. Harris would be an appropriate candidate for bond.
10     So the focus, as in each of these cases, I think, is
11 on the offense conduct.  And so specifically the nature of the
12 offense charged, which goes to the weight of his dangerousness
13 to the community.  Obviously conspiracy to commit kidnapping is
14 a dangerous offense, and so the Court has to consider whether
15 or not that offense is an ongoing risk to the public.
16     In this case Mr. Kessler has laid out a number of --
17 has pointed to a number of the exhibits -- and I'm sorry, sir,
18 I didn't realize you were still here, you can step down -- but
19 I'm going to go through the allegations as I understand them
20 from the Complaint and from the witness's testimony that are
21 specific to Mr. Harris.
22     Back in -- on July 18 Mr. Harris and others met in
23 Ohio, and attendees at that exercise discussed attacking a
24 Michigan State Police facility.  As has been noted a couple
25 times, the fact that these field training exercises took place

1  I don't particularly credit as being indicative of any sort of
2  criminal intent, however, it's the discussions later on about
3  this plot as it develops that demonstrate dangerousness to the
4  community.
5            On August 9 Mr. Harris participates in another
6  tactical training in Munith.  There is some discussion about
7  kidnapping Whitmer.
8            Slightly later Mr. Harris participates in a group
9  chat and says -- which has been pointed out by the government
10 -- "Have one person go to her house, knock on the door, and
11 when she answers it just cap her.  At this point fuck it."  And
12 then it says "I mean catch her walking into the building and
13 act like a passersby and fixing dome her and then yourself,
14 whoever does it."  So that statement suggests a homicide but
15 then also a suicide in followup to that.
16           On August 23 Mr. Harris and the others meet at his
17 residence, this is the residence to which he asked to return,
18 and there is this discussion, as is mirrored in the group chats
19 prior to that, relating to concern about infiltration by law
20 enforcement.  And they are required to bring personal documents
21 to demonstrate who they are.
22           On September 12 and 13 there is another field
23 training exercise at Garbin's property in Luther at which
24 Mr. Croft constructs an IED and detonates it.  By noting that,
25 I don't mean to suggest, because I don't think there's evidence

1  that Mr. Harris had any part of that, but it is part of the
2  backdrop for consideration of the conduct that's attributable
3  to him.
4          Then there is this nighttime surveillance that
5  happens.  Mr. Harris does not go on that trip, on that
6  surveillance exercise, but according to testimony became aware
7  of that surveillance the next day and expressed regret that he
8  had not participated.
9          On September 13 the group talks again and Fox
10 confirms with the group that this is the group of people that
11 is going to kidnap Governor Whitmer.
12         On September 17 in an encrypted group chat,
13 Mr. Harris with the others, there is a discussion about this
14 protest at the Capitol and everyone agrees that they don't want
15 to bring attention to themselves.
16         And then on October 7 Mr. Harris is among the group
17 that goes to meet with what turns out to be an undercover
18 officer to make a payment on explosives and tactical gear.
19         There has also been the testimony from the agent
20 regarding Mr. Harris's behavior on the drive to meet the -- to
21 meet that undercover officer where he is repeatedly unloading,
22 dry firing, reloading and unloading a semiautomatic pistol and
23 is alleged to have pointed it at the CHS's head.
24         In addition, I also am concerned about Exhibit 28
25 which is the series of messages in which he is soliciting other

1  people to commit the murder of a police officer in Maine as
2  well as the officer's wife.  He also appears -- although he
3  does not appear thus far in the evidence to be a leader of the
4  conspiracy, he does drive a lot of the movement to be more
5  secure in communications including creating a separate group
6  chat when there is a concern about infiltration.
7        Mr. Douglas argues that location monitoring and house
8  arrest as well as not allowing any communication access, phones
9  or computer, would be sufficient.  And respectfully I disagree.
10 That even here where someone has no criminal history, the
11 evidence that has been laid out by the government is in my view
12 sufficient to sustain its burden by clear and convincing
13 evidence that there would be ways to get around that.  It is
14 not difficult to cut a tether and to leave.  And while law
15 enforcement has managed to infiltrate this group to a great
16 degree, there are lots of other people in the world who could
17 offer assistance.  So while this plot appears to have been
18 disrupted, it's not clear that additional -- that the movement
19 has ended and that there are not other individuals who would be
20 able to help Mr. Harris.
21       So based on all of that, I find by clear and
22 convincing evidence that no condition or combination of
23 conditions will reasonably assure the safety of any other
24 person in the community.
25       Mr. Harris, I am sure you don't agree with what I

```
 1  just decided, but did you understand everything that happened
 2  in court today?
 3          DEFENDANT HARRIS:  Yes, Your Honor.
 4          THE COURT:  Thank you.
 5          Anything else we need to take up in this matter,
 6  Mr. Kessler?
 7          MR. KESSLER:  No, Your Honor.
 8          THE COURT:  Mr. Douglas?
 9          MR. DOUGLAS:  No, Your Honor.
10          THE COURT:  All right.  We'll be adjourned.
11          THE CLERK:  All rise, please.  Court is adjourned.
12      (Proceeding concluded at 3:41 p.m.)
13                       *   *   *   *   *
14                          CERTIFICATE
15          I certify that the foregoing is a transcript from the
16  Liberty Court Recording System digital recording of the
17  proceedings in the above-entitled matter, transcribed to the
18  best of my ability.
19          I further certify that the transcript fees and format
20  comply with those prescribed by the court and the Judicial
21  Conference of the United States.
22
23  October 28, 2020
24
25                          /s/ Glenda Trexler
                            Glenda Trexler, CSR-1436, RPR, CRR
```